# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| In re the Marriage of: | No. 68424-8-I |
| NEHA VYAS CHANDOLA, | DIVISION ONE |
| Respondent, | |
| and | |
| MANJUL VARN CHANDOLA, | UNPUBLISHED |
| Appellant. | FILED: May 13, 2013 |

2013 MAY 13 AM 8: 46

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

Cox, J. — Primarily at issue in this appeal is the trial court's discretionary authority to impose restrictions in the parenting plan between Manjul Varn Chandola (Varn) and Neha Vyas Chandola (Neha).[1] The trial court's findings of fact are supported by substantial evidence and support the conclusions of law that restrictions are proper. Moreover, there is no evidence that the trial court based its decision on an improper basis. Finally, there is no showing of any denial of either due process or equal protection. We affirm.

Varn and Neha were married in 1998. They lived with Varn's parents in Arizona until they moved to the Seattle area in 2002. They are both attorneys.

---

[1] We adopt the naming conventions of the parties for clarity.

They have one young daughter, P.R.C., who was born in November 2008. Both sets of her grandparents lived with the family at their house in Kent during different periods of time and helped care for her.

In February 2011, Neha commenced this dissolution proceeding. Neha told Varn that P.R.C. complained of vaginal pain and that Neha was concerned about the possibility of sexual abuse. Varn agreed to Neha's request for a temporary order requiring supervision during his visits.

A court-appointed parenting evaluator, Dr. Jennifer Wheeler, concluded that there was insufficient evidence to indicate that Varn engaged in behavior that would be consistent with sexual abuse. The supervised visitation was lifted in December 2011, after mediation.

A seven-day bench trial took place in 2012. The central issue at trial was the residential schedule and requested restrictions in the parenting plan. A number of witnesses testified, including the parties, family members, friends of the family, and P.R.C.'s doctor. Two parenting evaluators, one on behalf of each party, also testified.

Based on the evidence and controlling law, the trial court ordered restrictions and a residential schedule with three different stages to promote the best interests of the child. The first stage consists of two visits with Varn every week with one of those visits being an overnight visit every week. In the second and third stages, P.R.C.'s time with Varn will increase, if Varn meets certain conditions.

Varn appeals.

## PARENTING PLAN

Varn argues that the trial court's restrictions in the parenting plan were not supported by the findings. We disagree.

An appellate court will not retry the facts on appeal and will accept the trial court's findings of fact as verities if they are supported by substantial evidence in the record.[2] "Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted."[3] This court does not review the trial court's credibility determinations, nor does it weigh conflicting evidence.[4]

Decisions concerning the provisions of a parenting plan are reviewed for abuse of discretion.[5] "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons."[6] "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard."[7]

---

[2] In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991).

[3] In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012), cert. denied, 133 S. Ct. 889, 184 L. Ed. 2d 661 (2013).

[4] In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

[5] In re Marriage of Littlefield, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997).

[6] Id. at 46-47.

[7] Id. at 47.

This court's review of whether the trial court's conclusions of law flow from its findings is de novo.[8]

### Adverse Effect on the Child's Best Interest

Varn argues that there were insufficient findings and no substantial evidence to justify restrictions under RCW 26.09.191(3)(g). We disagree.

RCW 26.09.191(3)(g) is a discretionary provision that permits a trial court to limit the terms of a parenting plan.[9] This discretionary authority of the court is conditioned on the existence of specific factors or conduct that the court expressly finds adverse to the best interests of the child.[10] "Imposing such restrictions 'require[s] more than the normal . . . hardships which predictably result from a dissolution of marriage.'"[11]

Here, the trial court found that Neha had established by a preponderance of the evidence that restrictions under RCW 26.09.191(3)(g) should be included in the parenting plan. More specifically, the court made the following finding, which is supported by substantial evidence:

> The court finds that the father's parenting history has had an adverse effect on the child's best interests pursuant to RCW 26.09.191(3)(g). See Memorandum [F]indings on Trial entered this date and incorporated by reference.[12]

---

[8] Watson v. Dep't of Labor & Indus., 133 Wn. App. 903, 909, 138 P.3d 177 (2006).

[9] Katare, 175 Wn.2d at 36.

[10] Id.

[11] Id. (alteration in original) (quoting Littlefield, 133 Wn.2d at 55).

[12] Clerk's Papers at 80.

The Memorandum Findings on Trial, which the trial court expressly incorporated into the above, identified the factors and conduct of Varn that the court found adverse to the best interests of the child:

> Prior to separation the father consistently engaged in a pattern of interaction with [P.R.C.] which while loving, caring, affectionate, enriching in an entertainment sense, and nurturing in some respects, nonetheless *lacked, in concerning degree, objectivity with respect to her healthy development. The father was unwilling or unable to establish boundaries, routines, schedules, and structure. He discouraged exploration and independence.* Varn may best be described prior to separation as a doting father but ineffective parent. This is not an entirely unusual situation but *he also actively undermined the mother's efforts to provide these essential parenting components resulting in an imbalance that appears to have had adverse consequences for the child.* The court is unable to conclude that it was the father's design to undermine the mother but the consequences for the child are the same. It is telling that subsequent to separation the child's behavior repertoire increased dramatically . . . . As more than one lay witness observed since separation "[P.R.C.] is a changed child, more outgoing, interactive . . . ."[13]

On appeal, Varn assigns error to five of the trial court's findings regarding his parenting history. But, he only discusses two of these findings when he challenges the trial court's determination that he was an "ineffective parent." Thus, we need only address whether these two findings are supported by substantial evidence.

First, the trial court found that Varn "discouraged [P.R.C.'s] exploration and independence." A family friend, Rahul Gupta, testified that it appeared that Varn did not want P.R.C. to explore and engage with other children and adults.

---

[13] Id. at 92-93 (emphasis added).

A neighbor, Carol Johnston, testified that Varn would hold P.R.C. a lot and would not let her get down and play. Another family friend, Anjulie Ganti, described Varn as a "hovering" parent who was "always" holding P.R.C. and not letting her explore. Gupta also testified that Varn wanted somebody to be in the room with P.R.C. while she slept, and he refused to use a baby monitor.

Dr. Jennifer Wheeler was the court-appointed parenting evaluator. She interviewed both parents, the child, and others in preparing her written evaluation and recommendations to the court. At trial, she testified that Varn's constant holding of P.R.C. was behavior that appeared to be "more about father's anxiety about what might happen if he put her down and regulating his own anxiety versus recognizing what's really best for her in that particular situation." Dr. Marsha Hedrick, a parenting evaluator that Varn called on his behalf, agreed that this behavior was problematic in terms of the child's best interests.

This evidence is sufficient to persuade a fair-minded person that Varn "discouraged [P.R.C.'s] exploration and independence."

Second, the trial court found that Varn was "unwilling or unable to establish boundaries, routines, schedules, and structure." Dr. Hedrick, who reviewed Dr. Wheeler's report, testified at trial that Varn appeared to be "overly permissive in his parenting" regarding P.R.C.'s eating and sleeping.

Neha's mother, Kuldeep , Johnston, and Ganti agreed that Varn did not set routines or create structure around these activities. For example, they explained that Varn and his mother would chase P.R.C. around the house instead of feeding her at a table or in a high chair. Varn testified that he knew

6

that P.R.C.'s doctor recommended against giving P.R.C. a bottle of milk at night as she got older, but he would almost never decline P.R.C.'s request for a bottle. Neha testified that she was not able to implement a bedtime routine for P.R.C. until September 2010 when Varn and his parents started to leave the house after dinner.

Dr. Wheeler also testified that Varn was "very controlling" with "certain things" like car seats and baby monitors, but "[w]hen it came to the schedule, there was sort of this odd lack of structure and lack of control."

In sum, there is substantial evidence in this record to support the findings that Varn "discouraged [P.R.C.'s] exploration and independence" and that Varn was "unwilling or unable to establish boundaries, routines, schedules, and structure."

Varn argues that his discouragement of P.R.C.'s "exploration and independence" was not a problem at the time of trial. He points to Dr. Wheeler's testimony that P.R.C. was playing with the visitation supervisor's son. Nevertheless, the trial court was not convinced by his testimony that the "risks and hazards of his parenting choices going forward" would continue to improve. Thus, the trial court made a credibility determination, which this court does not review.[14]

Varn contends that the professionals who testified at trial thought P.R.C. had "always been a perfectly happy, healthy child, with normal development." A fair reading of the entire record, however, shows that Dr. Wheeler,

---

[14] In re Marriage of Rich, 80 Wn. App. at 259.

7

notwithstanding this observation, believed that parental behavior merited restrictions. Thus, this argument fails.

Varn argues that Drs. Wheeler and Hedrick did not have "any concerns about Varn's parenting [that] rose to a level requiring restrictions." This is inaccurate.

The record reflects that Dr. Hedrick criticized Dr. Wheeler's report for failing to tie her concerns about Varn to a basis for restrictions. But at trial Dr. Wheeler testified that while restrictions were not justified based on domestic violence, sexual abuse, or emotional impairment, she believed that Varn's "abusive use of conflict" was a different basis for restrictions. Dr. Wheeler admitted in her testimony that her written report did not "do an adequate job of connecting the dots between what [her] concerns were and the limitations to the schedule that [she was] recommending." But her testimony at trial was clear:

> My authority for my opinion is that the personality traits that I've been describing all morning in my opinion, the risk to [P.R.C.] of those traits is ongoing conflict that is essentially emotionally abusive to her. And I do think that until those traits are better regulated and [Varn is] able to interact with [P.R.C.] in a way that does not perpetuate this conflict and parent in a way that does not continue to inflame this conflict, I do think that father is vulnerable to engaging in abusive use of conflict. That supports generally why I am limiting his residential schedule relative to what you just referred to as the normal, typical kind of recommendation.[15]

In any event, it is the ultimate responsibility of the court, not the experts, to determine whether restrictions are required. The court did so here on the basis

---

[15] Report of Proceedings (Jan. 31, 2012) at 305-06.

of all the evidence, including the testimony of both parenting evaluators. There was no error in this respect.

Varn argues that it is common for parents to have different styles of parenting, and courts must tolerate these different styles. He contends that the trial court was "imposing [its] own preference regarding parenting style" because his parenting style did not result in any "demonstrable harm" to P.R.C. This argument ignores the record.

As discussed previously in this opinion, the findings of fact regarding Varn's parenting history are supported by substantial evidence. Moreover, the findings support the conclusion that his parenting had an adverse effect on P.R.C.'s best interests. Thus, the trial court was properly acting under the provisions of governing law, not imposing its own parenting style preference.

Varn argues that "[t]o illustrate the concern about imposing restrictions without a sufficient showing of harm, one could easily make arguments for restrictions against Neha as readily as Judge Doerty did against Varn." The premise of this argument is incorrect.

We have already identified the adverse effect that Varn's actions had on the child. In contrast, there is no showing that restrictions against Neha should have been imposed. As Drs. Wheeler and Hedrick testified, they did not have any serious concerns about Neha's parenting that would rise to the level of requiring restrictions.

Finally, Varn argues that "the due process clause prohibits imposing restrictions under RCW 26.09.191 without a showing that they are necessary to

avoid an identified harm to the child." He cites Troxel v. Granville[16] to support this assertion.

But as Varn acknowledges, this court has already rejected a similar argument in In re Marriage of Katare.[17] There, this court explained that Troxel does "not support [the father's] argument that a parenting plan that complies with the statutory requirements to promote the best interests of the children raises an issue of constitutional magnitude or violates a parent's constitutional rights."[18] Thus, this argument is not persuasive.

As noted above, Varn also assigned error to two other findings of fact. The first is that Varn "lacked, in concerning degree, objectivity with respect to [P.R.C.'s] healthy development." The second is that Varn "actively undermined the mother's efforts to provide these essential parenting components resulting in an imbalance that appears to have had adverse consequences for the child."

Varn fails to support these assignments of error with any argument or persuasive authority. Thus, we need not address them.[19]

*Restrictions*

Varn argues that the restrictions in the parenting plan were not supported by the findings. Specifically, he challenges three restrictions in the parenting

---

[16] 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

[17] 125 Wn. App. 813, 105 P.3d 44 (2004).

[18] Id. at 823.

[19] See State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992).

plan. None of his challenges are meritorious. All of the restrictions are reasonably calculated to address identified harm to the child.

"A trial court wields broad discretion when fashioning a permanent parenting plan."[20] But this discretion is guided by several provisions of the Parenting Act of 1987, including RCW 26.09.191, which sets "forth factors which require or permit limitations upon a parent's involvement with the child."[21] A primary concern in establishing parenting plans is that parenting arrangements serve the best interests of the child.[22] This court has held that "[a]ny limitations or restrictions imposed must be reasonably calculated to address the identified harm."[23]

The first challenged restriction is the limit on Varn's time with P.R.C., which is approximately 30 hours a week. Under the court's plan, this visitation was scheduled to increase in length over three stages if Varn continued to comply with certain requirements. This time restriction was supported by the trial court's Memorandum Findings on Trial:

> While it is cause for optimism that Varn has agreed to parenting plan provisions that recognize the importance of "[P.R.C.'s] set schedule for meal times, bed times, wake up times *etc.*", his testimony failed to persuade this court that he appreciated the down side of his approach before separation or the risks and hazards of his parenting choices going forward. This assessment of his testimony is consistent with Dr. Wheeler's concerns about his

---

[20] Katare, 175 Wn.2d at 35.

[21] Id. at 36.

[22] See RCW 26.09.002.

[23] Katare, 125 Wn. App. at 826.

11

difficulties with integrating data inconsistent with his view of reality. It is therefore necessary to impose such restrictions as may best be anticipated [to] assure the mother's parenting is not diluted by the father. Certainly a "fifty/fifty" parenting plan would not accomplish this.[24]

The time restriction in the residential schedule was a reasonable way to address Varn's unwillingness or inability to establish boundaries, routines, schedules, and structure; and help him develop objectivity with respect to P.R.C.'s development.

Varn argues that the evidence shows that he was "the primary parent during much of P.R.C.'s life," and this fact does not support the time restriction. But at trial, there was conflicting evidence whether Varn was the primary parent, and the trial court did not make a finding as to this fact. In any event, such a finding would not obviate the need for this restriction, given this record.

The second challenged restriction was that P.R.C. sleep in her own room at Varn's house unless the case manager recommends otherwise. This restriction was also supported by the trial court's findings which were, in turn, supported by testimony at trial.

In the Memorandum Findings on Trial, the trial court found that Varn was "unwilling or unable to establish boundaries, routines, schedules, and structure," which included P.R.C.'s sleeping routine. At trial, several witnesses' testimony supported this finding. They testified that Varn interfered with P.R.C.'s sleeping schedule by being in the same room as P.R.C. Neha testified that she felt like P.R.C. was not getting enough sleep because Varn would hold her in the middle of the night. Neha went on to explain:

---

[24] Clerk's Papers at 93.

12

sometimes children have to be soothed to go back to bed, but he would just randomly pick her up. At 2 in the morning, he's holding her. . . . And I felt that the co-sleeping was more disruptive and it wasn't healthy for her because she's not sleeping through the night.[25]

She also testified that Varn would show P.R.C. videos on the Internet until 1 a.m., which kept her from sleeping. Ganti's testimony corroborated this statement.

Several witnesses also testified to other interruptions of P.R.C.'s sleep. Ganti observed Varn's mom staying in the room while P.R.C. was sleeping. And, though Ganti offered the family a baby monitor to use while P.R.C. slept, she did not see the Chandolas use it. Johnston testified that P.R.C. often seemed "cranky and tired." Dr. Wheeler testified that she would support a restriction that would require that P.R.C. sleep in her own room if the parent trainer supported this restriction.

In contrast, Varn testified that P.R.C. had a difficult time sleeping. He asserts that she would go to sleep around 9 p.m. and then wake up again at 11 p.m., midnight, or 1 a.m. He testified it was his responsibility to help her get back to sleep, and he would use different noises including music from Internet videos to help her sleep.

Given the conflicting testimony of the parties regarding P.R.C.'s sleeping schedule and the testimony of Dr. Wheeler that supported this restriction, the trial court was well within its discretion to require P.R.C. sleep in her own room. This restriction is reasonably related to the identified harm to the child.

---

[25] Report of Proceedings (Feb. 1, 2012) at 411-12.

Varn argues that precluding P.R.C. from sleeping in his room would actually cause more harm to P.R.C. because she has never slept in her own room. But as noted above, this requirement is based on Dr. Wheeler's trial testimony and conditioned on the case manager's recommendation. Moreover, it could be altered depending on the case manager's observations of P.R.C.'s progress. Thus, Varn's argument is not persuasive.

The third challenged restriction limited Varn from having his parents present for more than 20 percent of his time with P.R.C. during stages one and two of the residential schedule. Again, this restriction was supported by the trial court's findings:

> Varn's opportunities to parent and to learn from the opportunities must in large part be without the presence of his parents. The court recognizes that there are several cultural aspects to the history of the marriage and these may or may not include the paternal grandparents approach and influence. Or it may be due to Varn being an only child, or likely a combination of both. Whatever the antecedents of the extended family dynamic the so called "team" approach at this time needs to stop. Therefore Varn's residential time must exclude his parents with occasional exceptions which may include [P.R.C.] visiting her grandparents in Tucson consistent with the other provisions of the plan.[26]

The trial court's findings appear to provide two reasons for the restriction on the involvement of Varn's parents: (1) provide Varn with opportunities to parent, and (2) improve the "family dynamic."

As discussed above, the trial court found that Varn was "unwilling or unable to establish boundaries, routines, schedules, and structure," but he was willing to work on following P.R.C.'s "set schedule for meal times, bed times,

---

[26] Clerk's Papers at 93-94.

wake up times, *etc.*" Ensuring that Varn mostly spends time with P.R.C. alone was a reasonable way to ensure that Varn establishes "boundaries, routines, schedules, and structure" for P.R.C. while still allowing the grandparents to be involved in P.R.C.'s life.

Moreover, Drs. Wheeler and Hedrick both testified that they were concerned about the family dynamic. As noted above, Dr. Wheeler reported that "[P.R.C.] became increasingly aligned with the father and paternal grandparents and relatively less aligned with the mother and maternal grandparents," which she described as harmful to P.R.C. Dr. Hedrick testified that the data in Dr. Wheeler's report made her "suspicious that these in-laws and this father had made it very difficult for this mother to have a reasonable relationship with the child."

Johnston, a neighbor, and , Neha's mother, testified that Varn and his parents seemed to encourage P.R.C. to choose Varn over Neha.

Again, restricting the amount of time Varn's parents can spend with Varn and P.R.C. was a reasonable way for the court to change and improve the family dynamic that had developed.

Varn argues that Dr. Wheeler did not identify any problem with P.R.C.'s relationship with Varn's parents and recommended that Varn and Neha support this relationship. While Dr. Wheeler noted in her report that P.R.C.'s relationship with her grandparents should be supported by her parents, as discussed above, she also explained that the family dynamic that had developed with Varn and his parents was harmful to P.R.C. Thus, this argument is not persuasive.

Varn argues that any effort to undermine Neha and P.R.C.'s relationship is no longer a problem because Neha and Varn live separately. Again, this view is contrary to Dr. Wheeler's recommendation. Thus, this argument fails.

Varn points out that Neha did not request the grandparent restriction. That is irrelevant. The trial court's duty is to determine whether the child's best interests require the imposition of restrictions irrespective of whether a party asks for such restrictions.[27] The trial court did so in this case.

In sum, these challenged restrictions were supported by the trial court's findings and were reasonably calculated to address Varn's parenting history, which had an adverse effect on P.R.C.'s best interests. The trial court did not abuse its discretion in imposing these restrictions on Varn in the parenting plan.

## UNPROVEN SEXUAL ABUSE ACCUSATIONS

Varn argues that the trial court failed to consider the distorting effects of the unproven sexual abuse accusations. There is no support in the record for this argument.

If sexual abuse accusations are proven, the trial court is "*required* to restrict [a parent's] residential time and to eliminate the mandatory alternative dispute resolution and mutual decision-making provisions of the parenting plan."[28] But if the sexual abuse accusations are unproven, the trial court still has *discretion* under RCW 26.09.191(3)(d) to place restrictions or limitations on a

---

[27] See Katare, 175 Wn.2d at 35-36.

[28] Watson, 132 Wn. App. at 232 (citing RCW 26.09.191(1)(b), (2)(a)(ii)).

parent if the evidence supports a finding that the parent's "involvement or conduct" has an adverse effect on the child's best interests.[29]

There is nothing in this record to show that the restrictions here were imposed based on sexual abuse. Rather, they were imposed based on other documented harm to the child's best interests.

Varn primarily relies on In re the Marriage of Watson[30] to support his argument. There, Division Two concluded that "the trial court exceeded its authority and abused its discretion in limiting [a father's] visitation after finding that the sexual abuse allegations were unprove[n]."[31] In that case, the mother obtained a protection order against the father alleging that the father had sexually abused their daughter after a final parenting plan was in place.[32] At first the father had no contact with his daughter and then he had two hours of professionally supervised visits for over two years.[33] After finding that the allegations were unproven, the court did not reinstate the parent's original parenting plan but added more restrictions on the father's visitation under RCW 26.09.191(3)(d).[34]

---

[29] Id.

[30] 132 Wn. App. 222, 130 P.3d 915 (2006).

[31] Watson, 132 Wn. App. at 225.

[32] Id. at 226.

[33] Id.

[34] Id. at 228.

Division Two acknowledged that the mother did not ask for restrictions under RCW 26.09.191, and thus, the issue was not properly before the court.[35] But, Division Two concluded that substantial evidence did not support the trial court's decision to restrict visitation under RCW 26.09.191(3)(d):

> The court found that conflict between the parents escalated following the entry of the parenting plan, but there are no findings indicating that [the father] caused the conflict. The court also found that [the daughter] had a subjective perception of sexual abuse and visitation anxiety but not that [the father] caused it.
>
> On the contrary, the evidence shows only that [the father] did the "most parenting he could" under the restrictive conditions available to him. In the absence of substantial evidence establishing a nexus between [the father's] "involvement or conduct" and the impairment of his emotional ties with [the daughter], the trial court erred in imposing visitation restrictions under RCW 26.09.191(3)(d).[36]

Division Two explained that the sole basis for the requested restriction was the sexual abuse allegations, and most of the litigation focused on whether the sexual abuse actually occurred.[37] The record in that case did not support the finding that emotional ties between the father and daughter were absent or impaired, which was required for a restriction under RCW 26.09.191(3)(d).[38]

In contrast to Watson, here, the trial did not base any part of its decision on whether Neha's accusations or concerns about sexual abuse were proven. Instead, the trial court imposed restrictions on the basis that Varn's "parenting

---

[35] Id. at 233.

[36] Id. at 234.

[37] Id. at 232-33.

[38] Id. at 233-34.

history has had an adverse effect on the child's best interest," which fell under the catch-all provision of RCW 26.09.191(3)(g). Unlike Watson, the trial court expressly found that Varn was an "ineffective parent" for a variety of reasons unrelated to sexual abuse. As discussed above, the trial court's findings are supported by substantial evidence, which in turn support the restrictions and limitations.

Varn argues that the effect of the accusations was that he had nearly one year of supervised visitation with P.R.C. leading up to the trial. He contends that the supervised visitations impacted Dr. Wheeler's observation of Varn, and they did not allow him the opportunity to show the improvements he was making. He argues that the trial court should have "disregarded Varn's marginalized status during the temporary orders . . . [and] looked instead to the situation that existed prior to Neha's accusations." But the trial court's findings demonstrate that it did just that. The trial court looked at the family situation before the temporary order and supervised visitation were in place, and it still found that restrictions were necessary.

Varn also contends that the trial court improperly credited all of P.R.C.'s improvement to Neha's parenting and did not consider that her improvements could be developmental. There simply is no support in the record for this assertion. There is no need to further address this argument.

Finally, Varn argues that RCW 26.09.002 provides that "the best interests of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered" as little as possible. This is a correct statement of the

law. But that statute does not overcome the requirements of RCW 26.09.191(3)(g), which control here.

## CULTURAL CONSIDERATIONS

Varn argues that the trial court's restrictions regarding co-sleeping and his parents' involvement denied his right to substantive due process and equal protection because the court failed to consider the family's Asian Indian culture. These arguments have no merit.

The Fourteenth Amendment of the United States Constitution protects the freedom of "'intimate association,'" which is derived from substantive due process concepts.[39] The United States Supreme Court has recognized that the right to "'intimate association'" protects "'the choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State.'"[40] These "intimate human relationships" include "the raising and educating of one's children"[41] and "cohabitation with one's relatives."[42]

Additionally, RCW 26.09.184(3) provides that a "court may consider the cultural heritage and religious beliefs of a child" when establishing a permanent parenting plan. "Moreover, parenting plans are individualized decisions that

---

[39] City of Bremerton v. Widell, 146 Wn.2d 561, 575, 51 P.3d 733 (2002) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 618, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)).

[40] Id. at 576 (quoting Roberts, 468 U.S. at 617-18).

[41] Id. (citing Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925)).

[42] Id. (citing Moore v. City of E. Cleveland, 431 U.S. 494, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977)).

depend upon a wide variety of factors, including '*culture*, family history, the emotional stability of the parents and children, finances, and any of the other factors that could bear upon the best interests of the child.'"[43]

As discussed above, the trial court restricted P.R.C. from sleeping in the same room as Varn and limited the involvement of Varn's parents. Before imposing these restrictions, the trial court appeared to take the family's culture into consideration in establishing the parenting plan. In the Memorandum Findings on Trial, the trial court recognized that "there are several cultural aspects to the history of the marriage and these may or may not include the paternal grandparents approach and influence." The trial court also heard testimony from Varn and Neha that it was customary in Indian culture for parents to sleep with their children and to have grandparents live with them and help provide care.

The trial court did not completely prohibit the paternal grandparents' involvement or co-sleeping with Neha and thus appears to have considered these cultural norms. Instead, the trial court put restrictions on Varn because it found that his approach to these two practices were adverse to P.R.C.'s best interests. As discussed earlier, a parenting plan that complies with the statutory requirements to promote the best interests of the child does not raise an issue of constitutional magnitude or violate a parent's constitutional rights.[44]

---

[43] In re the Parentage of Jannot, 149 Wn.2d 123, 127, 65 P.3d 664 (2003) (emphasis added) (quoting In re the Parentage of Jannot, 110 Wn. App. 16, 19-20, 37 P.3d 1265 (2002)).

[44] See Katare, 125 Wn. App. at 823.

21

Varn also argues that the "trial court's rulings on these issues amounted to national origin discrimination," which violated Varn's right to equal protection. But Varn fails to cite any authority to support this assertion or provide any other argument beyond this statement. Thus, we need not address this argument.[45]

## ATTORNEY FEES

Varn requests an award of attorney fees and costs. Neha did not request fees. We conclude Varn is not entitled to an award of fees or costs.

RCW 26.09.140 provides for fees on appeal in a dissolution matter. "Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs."[46]

We have considered the respective financial declarations that both parties filed and conclude an award of fees is not warranted.

We affirm the parenting plan.

Cox, J.

WE CONCUR:

---

[45] See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[46] RCW 26.09.140.